## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE REMICADE ANTITRUST | : | CIVIL ACTION |
| LITIGATION | : | |
| | : | |
| | : | |
| This document relates to: | : | |
| | : | |
| Direct Purchaser Actions | : | No. 18-cv-00303 (consolidated) |

## MEMORANDUM

**JOYNER, J.**                                    **OCTOBER 25, 2018**

Before the Court are Defendants' Motion to Compel Individual
Arbitration and Stay Proceedings (Doc. No. 29-1), Plaintiff's
Opposition thereto (Doc. No. 41), Defendants' Reply in Further
Support of their Motion to Compel (Doc. No. 48), and Plaintiff's
Sur-Reply in Further Opposition to Defendants' Motion to Compel
(Doc. No. 56).  We deny Defendants' Motion for the following
reasons.

## I. BACKGROUND

Defendants, Johnson and Johnson, and Janssen Biotech, Inc.
("J&J"), manufacturers of the biologic infliximab drug Remicade,
move to compel arbitration on an individual basis of all claims
asserted against them in this action by Plaintiff Rochester Drug
Cooperative, Inc. ("Rochester"), a drug wholesaler and direct
purchaser of Remicade, pursuant to an arbitration provision in a
2015 Distributor Agreement ("the Agreement") that Plaintiff
entered with JOM, Pharmaceuticals Inc., a J&J entity.  (Motion to

Compel at 2, Doc. No. 29-1). Plaintiff opposes the motion, arguing the arbitration clause does not encompass their federal antitrust claims alleging a complex scheme of anticompetitive conduct by Defendants that resulted in supracompetitive prices for infliximab products marketwide.

The Agreement establishes Rochester as an "Authorized Distributor of Record (ADR) and sets out various logistical obligations for distribution of J&J's pharmaceutical products. (Ex. A at 1, Doc. No. 29-3). Yet, the Agreement does not specify purchase prices. Included in the range of the parties' obligations under the Agreement are the products Rochester is authorized to distribute (§1.2) and in what geographic areas (§1.5); limitations on Rochester's authorization to distribute (it may not buy products from other than an authorized source, nor may it distribute expired, damaged, re-packaged or unauthorized products) (§1.4); requirements Rochester must meet for data reporting (§1.6); minimum annual volume of covered product purchases Rochester must meet to maintain ADR status (§1.9); terms for delivery and return of covered products (§§1.17 and 1.40), and other general terms related to distribution of a variety of J&J products (Ex. A, Schedule C).

A Dispute Resolution section in the Distributor Agreement provides that

> [a]ny controversy or claim arising out of or relating to
> this agreement. . . . shall be resolved by arbitration in
> accordance with the. . .Federal Arbitration Act, 9 U.S.C. §
> 1 et seq.
>
> The arbitrator must interpret any dispute arising out of or
> relating to this agreement in accordance with the laws of
> New Jersey. . . .There shall be no right or authority for
> any claims to be arbitrated on a class action basis.
>
> THE ARBITRATOR WILL NOT AWARD PUNITIVE, COVER, EXEMPLARY,
> MULTIPLED OR CONSEQUENTIAL DAMAGES, PREJUDGMENT INTEREST OR
> ATTORNEYS' FEES OR COSTS, EXCEPT AS MAY BE REQUIRED BY
> STATUTE AND EACH PARTY IRREVOCABLY WAIVES ANY RIGHT TO SEEK
> OR COLLECT ANY SUCH DAMAGES, PREJUDGMENT INTEREST, FEES OR
> COSTS IN ARBITRATION OR ANY JUDICIAL PROCEEDING. EACH PARTY
> IRREVOCABLY WAIVES ITS RIGHT TO TRIAL OF ANY ISSUE BY JURY.

§§ 4.21 (a), (b), (c), (d) (capitalization in original).

In February of 2018, Plaintiff filed an action on behalf of themselves and a proposed class of direct purchasers of infliximab products asserting claims against Defendants for violations of federal antitrust statutes, the Sherman Act (15 U.S.C. §§1 and 2) and Clayton Act (15 U.S.C. §§14, 15, 26).[1] Plaintiff claims they sustained antitrust injury through overcharges they paid as a result of Defendants' monopolizing the biologic infliximab drug market and artificially inflating infliximab prices marketwide.

Biologic drugs are made from living tissue (unlike chemically synthesized drugs) and are used to treat chronic auto-immune inflammatory diseases such as Chron's disease and Rheumatoid arthritis. Infliximab is a biologic infusion drug

---

[1] Unless otherwise noted, the following facts are taken from the Direct Purchasers' Amended Complaint (Doc. No. 12).

that has been engineered to inhibit auto-immune inflammatory conditions that chemically-synthesized drugs tend not to target. (Doc. No. 12, ¶4, ¶42). Biosimilars are biologic drugs that are "highly similar" to a "reference drug" that was already approved by the FDA, with "no clinically meaningful differences between the [biosimilar] product and the reference product in terms of safety, purity, and potency of the product." Id. at ¶13. In 2009, Congress passed the Biologics Price Competition and Innovation Act (BPCIA) in order to provide a shortcut to FDA approval and market entry for biosimilars. Id. at ¶11. The regulatory shortcut was intended to increase treatment options and lower health care costs by spurring biosimilar competition. Id. at ¶14.

Infliximab products can only be administered intravenously because if ingested orally they would be destroyed by the digestive system. Id. at ¶5. Due to their in-office administration and high cost (a single treatment costs thousands of dollars) id. at ¶60, fn 18, the drugs are usually purchased by health care providers who depend on reimbursement by insurance companies. Id. at ¶54, 55. When a "significant portion of a provider's patients are insured by plans that have agreed to exclude biosimilars to Remicade, (e.g, Inflectra, Renflexis)" due to the terms of J&J's exclusive contracts, the chances are low that any competitor biosimilar drug will be covered by insurance.

Id. at ¶60, fn 18.  Facing a risk that they might not be reimbursed if a biosimilar is not covered, providers are less likely to stock biosimilars.  On the other hand, providers can trust that Remicade (the reference drug) will be reimbursed, which allows Remicade to dominate the market even when competitors offer lower-priced biosimilars.

Rochester alleges that J&J's exclusive contracts, multi-product bundling, bundling of demand, and rebate penalties that threaten significant financial losses for administering or insuring a biosimilar comprise Defendants' "Biosimilar Readiness Plan" (the "Plan").  Id. at ¶24, ¶74, ¶79, ¶95.  The Plan made it financially impossible for insurers and providers to cover or purchase lower-priced biosimilars.  The alleged exclusion of biosimilars from the infliximab market enabled Defendants to maintain Remicade at supracompetitive prices and continually raise Remicade's list price.  Id. at ¶127, ¶162.  Rochester claims they paid artificially inflated prices for infliximab products "substantially greater than the prices they would have paid absent the unlawful conduct."  Id. at ¶146.  Plaintiffs seek damages for J&J's alleged antitrust violations, on behalf of itself and members of a proposed direct purchaser class.  Id. at ¶28.

In a related action, Pfizer Inc., v. J&J, 17-cv-04180, Pfizer brought claims of antitrust violations by J&J, alleging

that J&J's anticompetitive conduct had blocked Pfizer's competitor biosimilar, Inflectra, from the infliximab market. In August, 2018, this Court denied Defendants' motion to dismiss Pfizer's Sherman Act claims. (Doc. No. 58). This Court found that Pfizer's complaint alleged "sufficient factual matter" to make it facially plausible under the Iqbal and Twombly pleading standard that J&J "engaged in anticompetitive conduct and that Pfizer suffered antitrust injury as a result." Id. at 11. "J&J's efforts to foreclose Pfizer from the market, as Pfizer has alleged, have led to increased prices for consumers and limited competitive options for end payors, providers, and patients." Id. at 10, 14.

## II. LEGAL STANDARD

"When it is apparent, based on the 'face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.'" Abrams v. Chesapeake Energy Corp., No. 4:16-CV-1343, 2017 U.S. Dist. LEXIS 209905, at *23 (M.D. Pa. Dec. 21, 2017) (quoting Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 766 (3d Cir. 2013)). See Somerset Consulting, LLC v. United Capital Lenders, LLC, 832 F. Supp. 2d 474, 481 (E.D. Pa. 2011) (explaining that a motion to dismiss standard is applicable, before discovery has

occurred, "where the affirmative defense of arbitrability of claims is apparent on the face of the complaint."). <u>See Dean Witter Reynolds Inc. v. Byrd</u>, 470 U.S. 213, 220 (1985) (discussing the FAA's policy goals of enforcement of private agreements between parties and "efficient dispute resolution"). We consider Defendants' motion to compel arbitration of Plaintiff's statutory claims under a Rule 12(b)(6) standard, since the parties do not contest the enforceability of the Agreement's arbitration provision, only whether Plaintiff's statutory claims "aris[e] out of" the valid Agreement so to be arbitrable.

## III. DISCUSSION

Although Sherman Act claims are not precluded from resolution through arbitration, the Supreme Court has qualified its holding in <u>Mitsubishi Motors Corp.</u>, noting "'not…all controversies implicating statutory rights are suitable for arbitration.'" <u>Abrams v. Chesapeake Energy Corp.</u>, No. 4:16-CV-1343, 2017 U.S. Dist. LEXIS 209905 (M.D. Pa. Dec. 21, 2017) (quoting <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth</u>, 473 U.S. 614, 627 (1985)). Essentially, only those claims the parties have agreed to arbitrate should be submitted to "'an arbitral, rather than a judicial, forum.'" <u>Id</u>.

The Third Circuit has set forth "several long established principles" that should guide a court "in analyzing the arbitrability of a dispute":

> First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit."
>
> Second, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."
>
> Third, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims."
>
> Fourth, . . . "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'"

Emplr. Trs. of W. Pa. Teamsters v. Union Trs. of W. Pa. Teamsters, 870 F.3d 235 (3d Cir. 2017) (quoting United Steelworkers of Am., AFL-CIO-CLC v. Lukens Steel Co., Div. of Lukens, Inc., 969 F.2d 1468, 1473-74 (3d Cir. 1992); see AT&T Techs., Inc. v. Communs. Workers of Am., 475 U.S. 643 (1986)).

Because arbitration is a matter of contract, John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547 (1964), before compelling arbitration pursuant to the Federal Arbitration Act, a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of

that agreement.  Kirleis v. Dickie, McCamey & Chilcote, P.C., 560
F.3d 156, 160 (3d Cir. 2009).  "[I]n the FAA [Congress] expressed
a strong federal policy in favor of resolving disputes through
arbitration."  Century Indem. Co. v. Certain Underwriters at
Lloyd's, 584 F.3d 513, 522 (3d Cir. 2009).  However, this policy
does not lead automatically to the submission of a dispute to
arbitration upon a movant's request.  The Third Circuit has
emphasized that "the Supreme Court has repeatedly warned "against
'overread[ing its] precedent[]' concerning the presumption of
arbitrability.  E.g. Granite Rock Co. v. Int'l Bhd. of Teamsters,
561 U.S. 287, 130 S. Ct. 2847, 2857 (2010).  The presumption does
not "take[] courts outside [the] settled framework" of using
principles of contract interpretation to determine the scope of
an arbitration clause."  CardioNet, Inc. v. Cigna Health Corp.,
751 F.3d 165, 172-173 (3d Cir. 2014) (quoting Granite Rock, 130
S. Ct. at 2859).

   "[T]he basis for contractual arbitration is consent, not
coercion."  Century Indem. Co., 584 F.3d at 523 (citing
Mastrobuono v. Shearson Lehman Hutton, 514 U.S. 52, 115 S. Ct.
1212 (1995)).  Consent is a key factor in the determination of
whether an arbitration clause encompasses a disputed claim.
"[E]ven if a court finds that the parties have agreed to
arbitrate *some disputes it must find, to order arbitration, that
the parties have agreed to arbitrate the dispute in issue.*

*Because an arbitrator's authority derives solely from the parties' agreement to submit their disputes to arbitration, AT&T Technologies, Inc., 475 U.S. at 648-49, a party cannot be compelled to submit a dispute to arbitration unless it has agreed to do so. U.S. Small Bus. Admin. v. Chimicles, 447 F.3d 207, 209 (3d Cir. 2006)." Id. at 523 – 524.*

**A. Scope of the Arbitration Clause**

*"'[W]hether a dispute falls within the scope of an arbitration clause depends upon the relationship between (1) the breadth of an arbitration clause, and (2) the nature of the given claim.'" PDC Machs., Inc. v. Nel Hydrogen, No. 17-5399, 2018 U.S. Dist. LEXIS 142444 at \*13, (E.D. Pa. Aug. 22, 2018) (quoting CardioNet, Inc., 751 F.3d 172). Defendant asks this Court to consider the Distributor Agreement as a whole, in accordance with CardioNet's instructions that "courts 'are required to read contract language in a way that allows all the language to be read together, reconciling conflicts in the language without rendering any of it nugatory if possible,'" id. at 174, and with New Jersey contract principles directing that "words and phrases are not to be isolated but related to the context and the contractual scheme as a whole." Newark Publishers' Asso. v. Newark Typographical Union, 126 A.2d 348, 352-53 (1956). Here, considering the language of the Dispute Resolution provision as a whole, we find the scope of arbitrable disputes is limited to*

claims *"arising out of" the Distributor Agreement, and that this scope applies across all subsections of the Dispute Resolution section, including the damages provision and class action waiver.*

*In <u>CardioNet</u>, the Third Circuit interpreted the use of the word "disputes" across two sections of the contract that both applied to dispute resolution, in order to determine which issues were encompassed by the arbitration clause. An "Internal Dispute Resolution" provision preceded the "Arbitration" provision and narrowed the scope of arbitrable issues to those "disputes* that might arise between the parties regarding the performance or interpretation of the Agreement. [§6.3]." <u>CardioNet, Inc.</u>, 751 F.3d 173, (emphasis added). The subsequent Arbitration section provided "[a]rbitration is the exclusive remedy for the resolutions of *disputes* under this Agreement. [§6.4]" <u>Id.</u> (emphasis added). The Court found that the arbitration provision's reference to "disputes," which appears after the Internal Dispute Resolution, does not broaden the scope of arbitrable issues because "[w]ere we to hold that 'disputes' as used here signifies a broader swath of disagreements, it would render the first sentence of Section 6.4 devoid of meaning. . . .the words 'dispute' and 'disputes' . . .clearly refer[] to the narrower set of disputes concerning the Agreement's performance and interpretation." <u>Id.</u>

Here, the Dispute Resolution section of the Agreement begins with an arbitration provision directing that "[a]ny *controversy or claim* arising out of or relating to this agreement. . . .shall be resolved by arbitration." §§4.21 (a), (b) (emphasis added). A later subsection states that "EACH PARTY IRREVOCABLY WAIVES ITS RIGHT TO TRIAL OF ANY *ISSUE* BY JURY." §4.21 (d) (emphasis added). Defendants argue first that the arbitration provision is broad enough to encompass statutory claims, although they are not mentioned, and second, that the jury waiver establishes "there can be no doubt that [Rochester] was aware it was giving up the right to a jury trial." (Def. Reply at 11).

The Restatement (Second) of Contracts §202 provides guidance that "a word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph." So we find that the word "issue" in the jury trial waiver does not broaden the scope of arbitrable disputes, and applies only to those disputes "arising out of or relating to this agreement." §4.21 (a). The scope of the class action waiver providing that "[t]here shall be no right or authority for any *claims* to be arbitrated on a class action basis," §4.21(c)(emphasis added), is similarly limited to "claims" "arising out of or relating to this agreement." §4.21(a).

While Defendant argues that §4.21 (d) of the Agreement, providing that "an arbitrator is empowered to grant statutory

remedies," "leaves no doubt as to the parties' intention: statutory claims are to be addressed through arbitration," (Def. Reply at 9), we agree with Plaintiff that this provision presupposes the claim at issue is subject to arbitration under §4.21(a). "*If* a claim, such as for breach of the Distributor Agreement, falls within §4.21 (a), *then* §4.21(d) provides 'the arbitrator will not award punitive, cover, exemplary, multiplied, or consequential damages, prejudgment interest or attorney's fees or costs except as may be required by statute." (Pl. Sur-Reply at 12). We also note that the arbitration clause itself does not refer to statutory claims of any kind, and the damages provision "does not address, or even reference statutory claims (much less mention 'antitrust' or 'overcharge' claims." <u>Id.</u> at 13. As Plaintiff argues, "'[e]xcept as may be required by statute,' simply preserves certain damages as may be required by New Jersey statutes for claims otherwise encompassed by [the arbitration clause] §4.21 (a)," <u>id.,</u> since any dispute arising out of the agreement must be interpreted "in accordance with the laws of New Jersey." §4.21(c).[2]

---

[2] In their responsive motions to Defendants' Motion to Compel, the parties debate whether New Jersey's "clear and unambiguous" waiver standard should be applied to Plaintiff's federal antitrust claims; and if so, whether the arbitration clause satisfies <u>Moon</u>'s three requirements in order for a clause to cover statutory claims (incorporating the New Jersey Supreme Court's standard for knowing waiver of statutory rights in <u>Garfinkel</u> and <u>Atalese</u>): "First, it must identify the general substantive area that the arbitration clause covers. . . .Second, it must reference the types of claims waived by the provision. . . .It need not, however, mention the specific statutory rights at issue. . . .Third, it must explain the difference between arbitration and litigation." <u>Moon</u>, 868 F.3d at 214.

    Here, the parties agreed that New Jersey law would govern interpretation of disputes "arising out of" the agreement. (§4.21 (c), Ex. A at 20, Doc. No. 29-3). In <u>Volt Info. Scis. v. Bd. of Trs</u>, the Court held that the parties' agreement to specify that the law of the state where the subject of the agreement was located was "fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the [FAA] would otherwise permit it to go forward." <u>Ford v. Nylcare Health Plans</u>, 141, F.3d 243, 248 (5th Cir. 1998) (quoting <u>Volt Info. Scis. v. Bd. of Trs.</u>, 489 U.S. 468, 479 (1989)). However, for the above and forthcoming reasons, we find it possible to say "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." <u>United Steelworkers of Am., AFL-CIO-CLC v. Lukens Steel Co., Div. of Lukens, Inc.</u>, 969 F.2d 1468, 1473-74 (3d Cir. 1992). So, we find it unnecessary to analyze whether <u>Moon</u>'s application of New Jersey's "clear and unmistakable" waiver test is preempted by the FAA, and similarly unnecessary to apply <u>Moon</u>'s three-part test, since Plaintiff's antitrust claims are not within the scope of arbitrable disputes "arising out of" the Agreement.

In <u>Moon</u>, the Third Circuit applied similar principles of contract interpretation when it emphasized the difference between arbitration agreements that contain a phrase limiting the scope of arbitrable issues to "this agreement" and those without one. See <u>Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 773 A.2d 665, 668 (2001)</u>; <u>Atalese v. U.S. Legal Servs. Grp., L.P.</u>, 99 A.3d 306, 310 (2014) (finding statutory claims not covered by arbitration clauses that limited the scope of arbitral disputes to those arising from or relating to "this Agreement."). In <u>Moon</u>, the Court found Appellants' statutory claims were not covered by the arbitration clause because "the clause likewise only include[d] 'a dispute between Dancer and Club under this Agreement.' (citation omitted)" <u>Moon v. Breathless Inc.</u>, 868 F.3d 209, 211, 216 (3d Cir. 2017). The Court distinguished the arbitration clause in <u>Martindale v. Sandvik, Inc.</u>, 173 N.J. 76, 800 A.2d 872 (2002), which covered statutory claims, because it "lacked a limiting principle, such as a reference to an agreement." <u>Id.</u> at 216. We find the arbitration clause here to be more like the clauses in <u>Moon</u>, <u>Garfinkel</u> and <u>Atalese</u>, because it applied to disputes arising from "this agreement."

Along the same lines, we find no "manifestation of intention" that antitrust claims should be encompassed within the scope of arbitrable disputes. <u>Newark Publishers' Asso. v. Newark</u>

_Typographical Union_, 22 N.J. 419, 126 A.2d 348, 352 (1956).  In

_Newark Publishers' Asso._, which encompassed "'any dispute'

arising under the contract. . . _except as 'otherwise herein_

_provided_,'" id. at 351 (emphasis added), the express exemption of

claims showed that the parties clearly intended for any claims

not exempted to be arbitrable.  Yet here, the arbitration clause

does not expressly exempt certain kinds of claims, therefore,

only claims "arising out of. . .this agreement" are subject to

arbitration.  We read the arbitration clause within context,

"related to the relevant circumstances and the apparent objects

the parties were striving to attain," id., and find no intention

to include statutory antitrust claims within the scope of

arbitrable disputes.

**B. Whether Plaintiff's Antitrust Claims "Arise Out Of" the**

**Agreement**

Defendants argue that Plaintiff's antitrust claims must be

arbitrated because they would not have standing to sue without

having entered the Distributor Agreement, while Plaintiff argues

their statutory claims are not arbitrable because they arise out

of Defendants' "Biosimilar Readiness Plan," distinct from the

Agreement.  It is settled that "claims under the Sherman Act 'are

appropriate for arbitration.'"  Spinelli v. NFL, 96 F. Supp. 3d

81 (S.D.N.Y. 2015) (quoting Mitsubishi, 473 U.S. at 633-34).

However, we must consider "whether the factual underpinnings of

those claims 'touch' matters covered by the arbitration provision
–i.e., matters 'in connection with' or 'arising out of or
relating [to]' the []Agreement."  PDC Machs., Inc. v. Nel
Hydrogen, No. 17-5399, 2018 U.S. Dist. LEXIS 142444, at *13,
(E.D. Pa. Aug. 22, 2018).  The Third Circuit has emphasized that
"the arbitrability of a given dispute depends not on the
particular cause of action pleaded, but on the relationship of
the arbitration clause at issue to the facts underpinning a
plaintiff's claims."  The Court noted because some statutory
claims "often fall within the scope of. . .arbitration clauses,"
as CIGNA argued in CardioNet and as J&J argues here (Def. Reply
at 10), "that bears little relevance to whether *these* [statutory
claims] fall within the scope of *this* arbitration clause."
CardioNet, Inc., 751 F.3d at 176 (emphasis in original).

Here, J&J asks us to apply the Second Circuit's expansive
view that Plaintiff's standing as a direct purchaser and their
allegations of overcharges due to supracompetitive infliximab
prices makes their statutory claims "arise under" the Agreement.
In JLM Indus., the Second Circuit, assessing whether Sherman Act
claims were covered by a "broad" arbitration clause, focused on
"the factual allegations in the complaint rather than the legal
causes of action asserted."  JLM Indus. v. Stolt-Nielsen SA, 387
F.3d 163, 173, 2004 AMC 2805 (2d Cir. 2004) (quoting Oldroyd v.
Elmira Sav. Bank, FSB, 134 F.3d 72, 77 (2d Cir. 1998)).  The

Court noted that the damages Plaintiffs suffered due to Defendants' conspiracy "result from the fact that it entered into the charters, each of which specifies price terms which are variously characterized in the amended complaint as 'artificially high' and as 'overpayments.' . . .[T]his is a dispute 'arising out of' the charters." Id. at 17. Even where Plaintiffs' factual allegations concerned matters beyond contract formation and performance, id. at 175, the Second Circuit found sufficient factual relationship to hold the statutory claims arose from the underlying agreement.

Here, Rochester argues for a different analytic approach, in line with the "breach of contract" analysis adopted by the Fifth Circuit in Ford; the Third Circuit in CardioNet, Flaghouse, and Moon; and the Eastern District of Pennsylvania in PDC Machs, Inc. Plaintiff argues the "factual underpinnings," Medtronic AVE Inc. v. Advanced Cardiovascular Sys., 247 F.3d 44, 55 (3d Cir. 2001), of their statutory claims are not premised on the Agreement, so they do not "arise from" the Agreement, for two reasons. First, their antitrust claims are "not narrowly focused on Remicade, [the drug covered by the Agreement] but instead concern the entire market for infliximab including overcharges on biosimilar infliximab products manufactured by J&J's rivals." (Pl. Sur-Reply at 12). Second, their antitrust claims do not amount to a claim of breach of the Distributor Agreement, so resolving their claims

will not depend on "resolving some dispute over the meaning or terms of the Distributor Agreement, but on application of the antitrust statutes to J&J's Plan." Id.

Even applying JLM Indus.'s standard, we still find Plaintiff's antitrust claim does not "touch matters covered by the parties' [Distributor Agreement]," JLM Indus. 387 F.3d at 172, because neither the complaint nor Defendant's motion to dismiss references the Agreement, and the Agreement does not specify price terms, instead only generally providing that the "Company and its affiliates will sell Products to the Distributor at the applicable. . .'List price'" and logistical provisions on when "List Price changes will be effective." (§1.12, Ex. A at 4, Doc. No. 29-3). Further, Plaintiffs explain that "even [their] direct purchases of Remicade, both the volume of purchases and prices paid, will not be proven by the Distributor Agreement, but through Defendants' computerized sales transaction data." (Pl. Sur-Reply at 10).

In PDC Machs., Inc., Plaintiff PDC, a company that developed and provided technology for the "specialty gas and chemical processing industries worldwide," had entered several agreements with Defendant Nel, a hydrogen company, covering PDC's development of hydrogen compressors for Nel. PDC Machs., Inc. v. Nel Hydrogen, No. 17-5399, 2018 U.S. Dist. LEXIS 142444, at *3-4 (E.D. Pa. Aug. 22, 2018). "The Cooperation Agreement govern[ed]

'[a]ll purchase of goods between [Nel] and [PDC],' and
addresse[d] how orders are to be placed, confirmed, and
cancelled, and issues such as quality standards for the goods,
the applicable warranty, procedures for complaints and for repair
and replacement of defective materials, shipping, payment terms,
technical support, and insurance." Id. at *4. Additionally, "PDC
and Nel entered into a 'Confidential Non Disclosure Agreement'
(the Nel NDA) which 'set forth the rights and obligations of the
Contract Partners [i.e., PDC and Nel] with respect to . . .
safeguarding of Proprietary information...." Id. at *3.

The Distributor Agreement here similarly "covers various
topics related to the distribution of pharmaceutical products,
including such mundane day-to-day minutiae as the type of wooden
pallets [Plaintiff] should use for product storage. [§] 1.43."
(Def. Opp. at 3, fn 2). Notably, the Agreement only includes
general terms for purchasing products at a "list price," §1.12,
and at an "annual minimum purchase volume," §1.9, though those
products are not limited to Remicade. The Agreement does not set
or state a specific purchase price for Remicade.

Contrary to J&J's arguments, the Agreement's general
reference to pricing terms (§1.12) and its establishment of
Rochester as a distributor of various J&J products, hardly
constitutes a factual basis for Plaintiff's allegations of
complex anticompetitive conduct resulting in monopolization of

the infliximab market.  PDC Machs., Inc. is analogous, where

Plaintiff brought statutory claims relating to trade secrets.

Defendant Nel argued that PDC's statutory claims were

sufficiently factually "related to" the Cooperation Agreement

because the Agreement covered the sale of compressors that

plaintiff alleges defendant misused.  No. 17-5399, 2018 U.S.

Dist. LEXIS 142444, at *15.  However, the analysis is not as

rudimentary as Defendants in both PDC and here make it out to be.

Here, J&J argues that because the Distributor Agreement relates

to purchases of Remicade, Plaintiff's allegation that it paid

overcharges for its purchases of infliximab products means that

those claims "arise out of" the Agreement.  Yet, in PDC Machs.,

Inc., that the underlying agreement concerned "purchases" of

compressors did not sufficiently connect Plaintiff's statutory

claims to the agreement to make them arbitrable.  "The

Cooperation Agreement does not. . .'expressly prohibit[] the

misuse of proprietary information' or otherwise impose any

confidentiality obligations on Nel.'" PDC Machs., Inc. v. Nel

Hydrogen, No. 17-5399, 2018 U.S. Dist. LEXIS 142444, at *19 (E.D.

Pa. Aug. 22, 2018) (quoting Simula, Inc. v. Autoliv, Inc., 175

F.3d 716 (9th Cir. 1999)).  We apply this reasoning to

Rochester's federal antitrust claims.

    Here, the Distributor Agreement does not expressly prohibit

anticompetitive conduct or impose obligations to uphold specific

antitrust statutes.  Here, Rochester's antitrust claims do not

"relate to the parties' obligations under the [Agreement]," id.

(quoting Microbilt Corp. v. Chex Sys., Inc. (In re Microbilt

Corp.), 588 F. App'x 179, 180-81 (3d Cir. 2014)), and therefore

are not encompassed by the arbitration clause where there is

nothing in the agreement "'covering the [the anticompetitive]

conduct at issue.'"  Id.  See PNY Techs., Inc. v. Samsung Elecs.

Co., No. 10-4587, 2011 U.S. Dist. LEXIS 26784, 2011 WL 900154, at

*2-6 (D.N.J. Mar. 14, 2011) (finding statutory claims "subject to

arbitration based on arbitration clauses in three subsequent

agreements between the parties. . .[which] all contained

confidentiality provisions covering the disclosures at issue.").


    The Third Circuit's reasoning in CardioNet also applies

here.  In CardioNet, Plaintiffs, providers of outpatient medical

services used by physicians for monitoring cardiac arrhythmias,

had entered an Administrative Services Agreement (the

"Agreement") with Defendant, CIGNA Health Corporation, which had

provided coverage for these services for several years before

abruptly ending it.  The Agreement set the reimbursement rate for

covered services.  CardioNet, Inc.,751 F.3d at 169.  Defendants

subsequently released a policy update ("the Physician Update") to

hundreds of thousands of physicians in its network claiming it

would not cover Plaintiff's device because defendants considered

it "experimental, investigational, and unproven." Id. at 169.
Among other claims, Plaintiffs' complaint alleged "that the
Physician Update constituted a misleading and deceptive
commercial or promotion, in violation of. . .the Lanham Act."
Id. at 170.  Defendant moved to compel arbitration of Plaintiffs'
statutory claims, arguing they were encompassed by an arbitration
clause in the Agreement.

However, the Third Circuit found Plaintiffs' Lanham Act
claims did not arise from the Agreement under which Defendants
were obligated to cover Plaintiffs' cardiac services because the
source of the statutory injury was distinct from the Agreement.
Id. at 175.  Applying CardioNet, we look to the relationship
between the harm alleged in Plaintiff's Sherman Act allegations
and the Defendants' obligations under the Distributor Agreement.
We find Plaintiff's Sherman Act claims are separate from the
Agreement, as the Physician Update was distinct from Plaintiffs'
Lanham Act claims.  Similar to CardioNet, "whether [J&J, as an
affiliate of JOM] performed its obligations under the Agreement
has no bearing on whether it harmed [Rochester]," id., by
coercing insurers and providers into exclusive contracts,
threatening to withdraw substantial rebates, and effectively
inflating prices for infliximab products marketwide.

The CardioNet court also noted, in deciding Plaintiff's
statutory claims were beyond the scope of arbitration, that

resolving them "does not require construction of, or even reference to, any provision in the Agreement. . . .Quite the contrary, whether CIGNA performed its obligations under the Agreement has no bearing on whether it harmed the Providers by providing physicians with misleading information on [Plaintiffs'] services." Id. Here, Plaintiff Rochester argues that the harm from J&J's anticompetitive Biosimilar Readiness Scheme exists independent of the Distributor Agreement and therefore does not rely on the Agreement for resolution. In fact, identical claims have been brought by plaintiffs who did not enter distributor agreements with JOM. (Sur-Reply at 27). CardioNet anticipated this argument when it held "theoretically, any [services] manufacturer, whether it had entered into an in-network Agreement with CIGNA or not, would be harmed by the misleading statements ostensibly made by CIGNA about the [Plaintiffs'] technology and would have a basis for bringing claims identical to the Providers' claims here." Id. That is the case here, where plaintiffs who did not enter into agreements with JOM or its affiliate allege they were harmed by the anticompetitive conduct that is the basis for Rochester's statutory claims. See National Employees Health Plan, et al., v. J&J (17-cv-04326, Doc. No. 53); See Walgreen Co. and The Kroger Co., v. J&J (18-02357, Doc. No. 1). Thus, applying the Third Circuit's approach in

CardioNet, we find Plaintiff's Sherman Act claims are separate from, and cannot be resolved based on, the Distributor Agreement.

Third Party Advantage Adm'rs, Inc., also found that "[b]ut for the contractual relationship between [the defendant] and plaintiffs, [the defendant] could not have committed the alleged torts and violation of the Texas Theft Liability Act." (No. 3:06-CV-0534-G ECF, 2006 U.S. Dist. LEXIS 85456, at *19. Not so here. Rochester alleges that it was injured by overcharges it paid for infliximab products – including, but not limited to the drug covered by the Agreement, Remicade. In other words, Defendant's alleged anticompetitive scheme to inflate prices for Remicade had marketwide effects and could have been committed without the Distributor Agreement with Rochester. Unlike in Third Party Advantage Adm'rs, Inc., where "it [was] the existence of the asset purchase agreement that gave rise to the possible assertion of the claims alleged," id., here, even if Rochester had not entered the Distributor Agreement with JOM, they still could have alleged antitrust injury from the "overcharges on biosimilar infliximab products manufactured by J&J's rivals." (Pl. Sur-Reply at 12).

Abrams is distinguishable on similar grounds. There, Sherman Act claims were found to be arbitrable where Plaintiffs only had standing to bring their statutory claims because of their status as leaseholders receiving royalties under the

Agreement, and because Plaintiffs' alleged antitrust injury was premised on the specific terms of their underlying agreement – providing for "signing bonuses and royalties paid." Abrams v. Chesapeake Energy Corp., No. 4:16-CV-1343, 2017 U.S. Dist. LEXIS 209905 at *33 (M.D. Pa. Dec. 21, 2017). Here, by contrast, Rochester's Sherman Act injury is not "premised on the amount" of overcharge they paid for Remicade alone.

A related approach to whether an arbitration clause encompasses statutory claims focuses on whether the claims are "in essence a breach of contract claim or based on a breach of the [contract]." Ford v. Nylcare Health Plans, 141 F.3d 243, 250 (5th Cir. 1998). Here, Rochester argues that their statutory claims are not a claim of breach, (Pl. Sur-Reply, at 28), nor does the antitrust claim "involve a core issue of the contract[] between the parties," JLM Indus., 387 F.3d at 176, because the "Biosimilar Readiness Plan" reaches beyond causing overcharges for Remicade. Instead, the alleged anticompetitive conduct extends beyond obligations under the Agreement and caused overcharges not only for Remicade, but also for Inflectra and Renflexis, neither of which Plaintiff purchased from J&J under the Agreement.

In Ford, Plaintiff, a health care provider, had entered into an agreement with Defendants, HMOs, to provide medical services to patients covered under Defendants' insurance plans. Plaintiff

brought false advertising claims against Defendants, alleging violations of the Lanham Act.  Ford, 141 F.3d at 245.  Defendants moved to compel arbitration of Dr. Ford's statutory claims, based on an arbitration agreement that stated, "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof shall be settled by arbitration. . . ."  Id. at 246.

The District Court had decided not to compel arbitration of Plaintiff's false advertising statutory claims because "these claims would exist in the absence of the agreement between Dr. Ford and the HMOs and, therefore, did not arise out of or relate to that agreement."  Id. at 247.  Applying Texas law to determining whether the statutory claims were within the scope of arbitrable disputes, the Fifth Circuit analyzed whether the Plaintiff's Lanham Act claims could exist "without reference to a contract," or whether the allegations of statutory violation were "so interwoven with the contract that [they] could not stand alone."  Id. at 250, (quoting X.L. Ins. Co. v. Hartford Accident & Indem. Co., 918 S.W.2d 687 (Tex. App. 1996)).

Here, J&J argues that Rochester's statutory claims are arbitrable because they will, according to Defendants, need to reference the Distributor Agreement in order to assert their status as direct purchasers.  However, we find Ford persuasive.  The factual relationship test for determining whether a statutory claim is sufficiently related to an agreement to be arbitrable is

not done "to identify whether the facts in support of the action will implicate the agreement as an item of evidence but to uncover whether an action formally labeled a [statutory] tort is in essence a breach of contract claim or based on a breach of contract." Id. at 250.

Defendant tries to avoid application of Ford in the FAA context by citing cases where courts compelled arbitration of statutory claims found to "arise from" underlying agreements. Yet In re Pharmacy Benefit Managers Antitrust Litig. is distinguishable because there, the underlying agreement "establishe[d] the terms and conditions under which the Plaintiffs were to provide prescription drugs and services to plan members, and set[] forth an agreed reimbursement rate." In re Pharmacy Benefit Managers Antitrust Litig., 700 F. 3d 109, 112 (3d Cir. 2012), while here, the Distributor Agreement does not set an "agreed" price and it references price only in the context of logistical obligations such as when "list price changes will be effective" and "invoiced." §1.12.

Simula, Inc. v. Autoliv, Inc., is similarly distinguishable. Plaintiff's antitrust claim in Simula, unlike Rochester's claim here, included an allegation that the agreement it had signed with the defendant was "a primary reason why competition" had been suppressed in the relevant market. 175 F.3d 716, 722 (9th Cir. 1999). The causative relationship between the allegation

and the agreement meant the antitrust claims did "arise under" the agreement because resolving them would "necessitate interpreting the 1995 Agreement [containing the arbitration clause] to determine its meaning."  Id. at 721, 722.

By contrast, here neither party has alleged or claimed that the Distributor Agreement is integral to the Defendants' anticompetitive conduct.  As Plaintiff argues, resolving the antitrust claims will not require interpretation of the Distributor Agreement because the Agreement is irrelevant to the allegations that Defendant undertook anticompetitive conduct to maintain supracompetitive prices for Remicade and block lower-priced competitor biosimilars.  For these reasons, the Agreement here is not like the agreement in Simula, which was integral to the anticompetitive conduct at the heart of Plaintiffs' antitrust claims.  It is more like the agreement in CardioNet (discussed supra), separate and distinct from statutory claims.  Thus the statutory claims do not "arise from" the Distributor Agreement and therefore are beyond the scope of arbitrable disputes.

Defendants cite Innerwireless, Inc. v. Johnson Controls, Inc., as authority for the proposition that Ford is inapplicable because the Fifth Circuit did not analyze whether the arbitration clause was broad or narrow, "as is the circuit's practice when considering cases under federal arbitration law," Innerwireless, Inc., Civil Action No. 3:07-CV-312-M, 2007 U.S. Dist. LEXIS

63030, at *14, (N.D. Tex. Aug. 27, 2007).  However, we have analyzed the breadth of the arbitration clause.

Courts have distinguished "'narrow' arbitration clauses that only require arbitration of disputes 'arising out of' the contract from broad arbitration clauses governing disputes that 'relate to' or 'are connected with' the contract".  <u>Pennzoil Expl. & Prod. Co. v. Ramco Energy</u>, 139 F.3d 1061, 1067 (5th Cir. 1998).  However, <u>Pennzoil</u> addresses how to classify an arbitration clause, like the one in the Distributor Agreement, which "uses not only the phrase 'arising out of,' but also 'in connection with or relating to.'. . .[T]his is a 'broad' clause. . .not limited to claims that literally 'arise under the contract,' but rather embrace all disputes between the parties having a *significant relationship to the contract*" (emphasis added, <u>Pennzoil Expl. & Prod. Co. v. Ramco Energy</u>, 139 F.3d 1061, 1067 (5th Cir. 1998)).  We find Plaintiff's antitrust claims are not embraced by even the broad arbitration clause because the alleged anticompetitive conduct does not have a "significant relationship to the [Distributor Agreement]."

Furthermore, in <u>Third Party Advantage Adm'rs, Inc.</u>, applying federal law the court found that "plaintiffs' tort claims were 'embraced' by the underlying contract, which 'served as the conduit through which these alleged acts were made possible.'" <u>Innerwireless, Inc.</u>, Civil Action No. 3:07-CV-312-M, 2007 U.S.

Dist. LEXIS 63030, at \*14 (quoting <u>Third Party Advantage Adm'rs, Inc. v. J.P. Farley Corp.</u>, No. 3:06-CV-0534-G ECF, 2006 U.S. Dist. LEXIS 85456, at \*19 (N.D. Tex. Nov. 27, 2006). Even when we apply the "circuit practice" of characterizing the breadth of the arbitration clause, and consider whether the underlying contract "served as the conduit through which [Defendant's alleged anticompetitive antitrust violations] were made possible," we find that Plaintiff's antitrust claims do not arise from their Distributor Agreement with Defendant.

## IV. CONCLUSION

For the foregoing reasons, J&J's Motion to Compel Arbitration is denied. An appropriate Order will follow.